IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70003-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| MIGUEL TERRY BROWN, | ) | |
| | ) | |
| Appellant. | ) | FILED: August 18, 2014 |

SCHINDLER, J. — Miguel Terry Brown challenges his conviction of unlawful possession of a firearm in the second degree. Brown contends that the trial court erred in denying his motion to suppress. We affirm.

FACTS

According to the unchallenged findings of fact, on December 19, 2011, police officer Donald Ames observed Omar Sow[1] panhandling at a Tukwila gas station. Sow then got into the backseat of a green Ford Escort. Officer Ames contacted Sow and the two other occupants of the Escort. All three men, including the driver, smelled of alcohol and appeared to be intoxicated. Based on their obvious impairment and belligerent behavior, Officer Ames told the men to lock up the car and leave the area. Officer Ames testified that he told the three men they had to leave the car at the gas

_____

[1] Although the record contains different spellings of this name, we adopt the spelling set forth in the trial court's findings of fact and conclusions of law.

station "or they could find somebody who was sober and had a valid license that could drive the car and take them away."

Officer Ames initially parked his patrol car across the street from the gas station to watch the Escort while he performed other tasks. But the men could see the patrol car and continued to try to engage with Officer Ames. Officer Ames moved his car to a different location where he could still keep an eye on the Escort.

About 30 minutes later, the men returned to the Escort with an unknown fourth person and they all got into the car. Officer Ames saw the brake lights activate but from his vantage point across the street, could not see who was in the driver's seat.

Officer Ames drove back to the gas station to make sure that none of the three individuals he had previously contacted were attempting to drive the car and to ensure that the person who was about to drive the car was sober and had a valid license. Officer Ames parked at an angle 10 to 12 feet behind the Escort, without blocking it in. As he approached the driver's side door, Officer Ames saw that an unknown person, later identified as Miguel Terry Brown, was sitting in the driver's seat with the keys in the ignition and the engine running. Officer Ames asked to see Brown's driver's license. Brown told Officer Ames that he did not have a driver's license. As Brown spoke to him, Officer Ames detected alcohol on his breath.

Based on his belief that Brown was intoxicated and was about to operate a vehicle, Officer Ames asked Brown to turn off the engine and hand him the car keys. Officer Ames asked Brown to step out of the vehicle and, once he did so, asked for his name and date of birth. Based on the information Brown provided, Officer Ames learned that Brown had outstanding warrants. Officer Ames arrested Brown on the

warrants. When he placed handcuffs on Brown, Officer Ames saw the handle of a gun protruding from Brown's front pants pocket. After being advised of his Miranda[2] rights, Brown said that he had found the gun in Seattle the week before.

The State charged Brown with unlawful possession of a firearm in the second degree. Brown filed a CrR 3.6 motion to suppress. The court denied Brown's motion, concluding that Brown was not unlawfully seized because Officer Ames's contact with him while he was in the driver's seat of the Escort was a "valid social contact." Brown agreed to a bench trial on stipulated facts. The trial court found Brown guilty of the charge. Brown appeals.

## ANALYSIS

There is no dispute Officer Ames had no specific or particularized suspicion to justify detaining Brown for investigatory purposes until he detected the strong smell of alcohol when talking to Brown. Brown asserts that an unconstitutional seizure occurred when Officer Ames asked to see his driver's license. Brown assigns error to two of the trial court's findings of fact entered denying his motion to suppress: (1) the finding that Officer Ames "asked" for identification but did not "demand" that he produce it, and (2) the finding that Officer Ames "did not block" the Escort when he parked behind it. However, Brown does not argue that the findings are not supported by substantial evidence in the record and fails to support the assignments of error with argument as required by RAP 10.3(a)(6). Accordingly, we treat the findings as verities on appeal. State v. Moreno, 173 Wn. App. 479, 491, 294 P.3d 812 (2013), review denied, 177 Wn.2d 1021, 304 P.3d 115 (2013).

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Brown bears the burden of establishing that a seizure occurred in violation of article I, section 7. State v. Harrington, 167 Wn.2d 656, 664, 222 P.3d 92 (2009). Under article 1, section 7 of the Washington State Constitution, a person is "seized" when by means of physical force or show of authority, his or her freedom of movement is restrained and a reasonable person would not have believed he or she is (1) free to leave, given all the circumstances, or (2) free to otherwise decline an officer's request and terminate the encounter. State v. O'Neill, 148 Wn.2d 564, 574, 62 P.3d 489 (2003). This standard is "a purely objective one, looking to the actions of the law enforcement officer." State v. Young, 135 Wn.2d 498, 501, 957 P.2d 681 (1998). Police actions that will likely result in a seizure include:

> "[T]he threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."

Young, 135 Wn.2d at 512 (quoting United States v. Mendenhall, 446 U.S. 544, 554-55, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)).

A "social contact" does not amount to a seizure. Harrington, 167 Wn.2d at 664-65. A social contact is a type of interaction that "occupies an amorphous area . . . , resting someplace between an officer's saying 'hello' to a stranger on the street and, at the other end of the spectrum, an investigative detention." Harrington, 167 Wn.2d at 664. Without more, engaging a pedestrian in conversation in a public place does not raise the encounter to an investigatory detention requiring an articulable suspicion of wrongdoing. Young, 135 Wn.2d at 511; State v. Ellwood, 52 Wn. App. 70, 73, 757 P.2d 547 (1988). Likewise, no seizure occurs when an officer approaches a parked car, asks an occupant to roll the window down, and asks questions or asks for identification. See

e.g., O'Neill, 148 Wn.2d at 579-81 (occupant not seized when officer asked him to roll down the window, asked him to try to start his vehicle, then asked for identification); State v. Thorn, 129 Wn.2d 347, 354, 917 P.2d 108 (1996), overruled on other grounds by O'Neill, 148 Wn.2d at 579 (no seizure when police officer asked the driver of a parked car, " 'Where is the pipe?' " after seeing a flicker of light); State v. Mote, 129 Wn. App. 276, 292, 120 P.3d 596 (2005) (no seizure when officer asked occupants of a parked car what they were doing and for identification). The focus of the inquiry is not on whether the defendant's movements are confined due to circumstances independent of the police action, but on whether the police conduct was coercive. Thorn, 129 Wn.2d at 353.

The question of whether police conduct amounts to a seizure is a mixed question of law and fact. Harrington, 167 Wn.2d at 662. We give great deference to the trial court in resolving the facts, but the ultimate determination of whether those facts constitute a seizure is one of law that we review de novo. Thorn, 129 Wn.2d at 351. Unchallenged factual findings are treated as verities on appeal. State v. Armenta, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997).

Brown contends that being asked to produce a driver's license by an "armed and uniformed officer" elevated the encounter to a seizure. But in deciding what constitutes a seizure, our courts have consistently required some overt show of force or intrusive action above and beyond an officer approaching a vehicle and asking questions or asking for identification. See e.g., State v. DeArman, 54 Wn. App. 621, 624, 774 P.2d 1247 (1989) (seizure occurred when police pulled behind another vehicle and activated emergency lights); Ellwood, 52 Wn. App. at 73 (seizure occurred when police told

suspect to " '[w]ait right here' ")[3]; State v. Sweet, 44 Wn. App. 226, 230, 721 P.2d 560 (1986) (seizure occurred when officer called out, " 'Halt! Police!' "). Brown relies on Harrington, 167 Wn.2d at 669, and State v. Soto-Garcia, 68 Wn. App. 20, 25, 841 P.2d 1271 (1992). But unlike here, in Harrington and Soto-Garcia, the police encounters involved a "progressive intrusion" that culminated in a seizure.

In Harrington, a police officer made a U-turn, got out of his patrol car, and approached the defendant Harrington while he was walking on the sidewalk. Harrington, 167 Wn.2d at 660. The officer asked to speak with Harrington and began asking him questions. A second officer arrived and stood seven or eight feet from Harrington. Harrington, 167 Wn.2d at 660-61. The first officer asked Harrington to remove his hands from his pockets " 'to control Mr. Harrington's actions.' " Harrington, 167 Wn.2d at 667. The court determined at that point that a "reasonable person would not have felt free to leave due to the officers' display of authority." Harrington, 167 Wn.2d at 669-70. Likewise, in Soto-Garcia, the encounter became a seizure when the officer asked Soto-Garcia if he had cocaine on him and asked to search him. Soto-Garcia, 68 Wn. App. at 25.

Here, Officer Ames approached the vehicle to ensure that the inebriated individuals he contacted earlier were not attempting to drive the car and that as instructed, the driver was unimpaired and had a valid license. The officer intruded no more than necessary to ascertain this information. Officer Ames was alone and Brown was sitting in a parked car in a public place. The undisputed record shows that the

---

[3] Alteration in original.

encounter did not involve a progressive intrusion or a display of authority that resulted in a seizure. Officer Ames merely requested identification.

The Supreme Court decision in O'Neill is analogous and controls. In O'Neill, an officer approached a car parked in front of a store that was closed and had been recently burglarized. O'Neill, 148 Wn.2d at 571-72. The officer pulled up behind the car, activated his spotlight, and ran a computer check on the license plate. The officer learned that the car had been impounded within the last two months. O'Neill, 148 Wn.2d at 572. The windows of the car were fogged up, leading the officer to believe someone was in the car. The officer walked up to the driver's side door, shined his flashlight in the driver's face, and asked him to roll down the window. O'Neill, 148 Wn.2d at 572. After some discussion about what the driver was doing there, the officer asked for identification. The driver, O'Neill, said he had no identification and his license had been revoked, and gave the officer a name that turned out to be false. O'Neill, 148 Wn.2d at 572. The officer asked O'Neill to step out of the vehicle, and subsequent events led to O'Neill's arrest. O'Neill, 148 Wn.2d at 572-73.

The court held that under article I, section 7, O'Neill was not seized until he was asked to step out of the vehicle. O'Neill, 148 Wn.2d at 574. The court "reject[ed] the premise that under article I, section 7 a police officer cannot question an individual or ask for identification because the officer subjectively suspects the possibility of criminal activity, but does not have a suspicion rising to the level to justify a Terry[4] stop." O'Neill, 148 Wn.2d at 577. The court concluded that before that point, the officer did not

---

[4] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

use physical force nor display any show of authority. O'Neill, 148 Wn.2d at 577-78. The court observed:

> The reasonable person standard does not mean that when a uniformed law enforcement officer, with holstered weapon and official vehicle, approaches and asks questions, he has made such a show of authority as to rise to the level of a Terry stop. If that were true, then the vast majority of encounters between citizens and law enforcement officers would be seizures.

O'Neill, 148 Wn.2d at 581.

Likewise, in Mote, a police officer approached two people who sat in a car legally parked on a residential street late at night. The taillights and the interior lights of the car were on. Mote, 129 Wn. App. at 279-80. The officer parked behind the vehicle, approached the driver's-side window, and asked for identification from both occupants, who complied. Mote, 129 Wn. App. at 280-81. We held that even assuming that the officer used a spotlight when he approached the car, his actions would not constitute a seizure at that point:

> [The officer] did not turn on his siren or overhead lights. He did not display his weapon or make any physical contact with [the defendant], and he was alone. [The defendant] was in a car parked in a public place . . . . [The officer] requested and did not demand [the defendant]'s identification. Thus his use of language and tone of voice did not change this encounter from a social contact into a seizure.

Mote, 129 Wn. App. at 292.

Brown suggests that he was objectively not free to terminate the encounter in light of Officer Ames's testimony that had Brown tried to drive away, the officer would have followed and stopped the car. But Officer Ames testified that he would have attempted to stop the car only if the driver of the Escort had started to drive away before he was able to verify who was driving. Officer Ames testified that if he had been able to

verify that the driver was not one of the three men he believed to be impaired but before he detected alcohol, he would not have stopped the car.

We affirm.

WE CONCUR: